IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STEPHANIE BOTTOM,               )
                                )
          Plaintiff,            )
                                )
     v.                         )          1:21-cv-322
                                )
CITY OF SALISBURY, et al.,      )
                                )
          Defendants.           )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is a Motion for Summary Judgment filed by the remaining Defendants in this action — the City of Salisbury, Officer Devin Barkalow, and Officer Adam Bouk. (Doc. 54.) This court will grant in part and deny in part Defendants' motion.

## I.    FACTUAL BACKGROUND

This court's recitation of the facts is informed by several videos from dash mounted cameras and body worn cameras. See Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) (citing Scott v. Harris, 550 U.S. 372, 380–81 (2007)) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

This case arises out of a traffic stop on May 30, 2019.[1] (See Second Am. Compl. ("SAC") (Doc. 44) ¶ 1; see also (MSJ Br. (Doc. 55) at 1.) Police in Salisbury, North Carolina were participating in a multi-agency speed enforcement operation. (See Bouk Decl. (Doc. 54-1) ¶ 2.) Officers from the City of Salisbury and the Rowan County Sheriff's Office were involved in the operation, among others. (Id.) In speed campaigns such as this, officers "typically employ a near zero tolerance approach for speed violations, which means motorists are routinely stopped for driving ten miles over the posted limit." (Barkalow Decl. (Doc. 54-2) ¶ 3.)

As part of the operation, Officer James Hampton was on an overpass above I-85 facing southbound and using a handheld Lidar device to monitor the speed of vehicles driving north. (Id. ¶ 3; Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 33.) The operation was assigned a radio channel that all officers involved in the operation could access. (Bouk Decl. (Doc. 54-1) ¶ 4.) Police vehicles parked in a line on the on-ramp to I-85; when "Officer Hampton called out a speeding vehicle, the first in line police unit would pull out and effect the traffic stop." (Id.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

"Because Officer Hampton was clocking northbound traffic that had not yet reached the overpass, [officers in the line] usually did not see which vehicle Hampton was clocking until after hearing his radioed instructions relaying which vehicle to stop." (Id. ¶ 5; Barkalow Decl. (Doc. 54-2) ¶ 5.) Officer Hampton would radio a speeding "vehicle['s] description, speed, and distance." (Bouk Decl. (Doc 54-1) ¶ 5; Barkalow Decl. (Doc. 54-2) ¶ 5.)

Shortly after 8:00 p.m., the first car in the line was an unmarked Dodge Charger occupied by Rowan County Sheriff's Deputy Mark Benfield. (Bouk Decl. (Doc 54-1) ¶ 6; see also Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 16 (describing the primary vehicle as "unmarked").) The second car was a black and white police SUV occupied by Officer Adam Bouk and Salisbury Detective Devin Barkalow ("Individual Defendants"). (Bouk Decl. (Doc. 54-1) ¶ 3; see also Barkalow Decl. (Doc. 52-4) ¶ 3.) Officer Hampton called out an "SUV in the number one lane, looks like a Toyota gold in color" driving "80 [miles per hour] at 934 feet." (Smith Video (Doc. 59-1) at 2:20-2:40.) Officer Benfield followed the Toyota and activated his emergency lights to make a traffic stop. (See Benfield Incident Report (Doc. 54-4) at 3-4.) Shortly thereafter, Officer Benfield radioed that the vehicle was not stopping. (See id.) Officer Bouk entered I-85 and

- 3 -

activated his lights and siren. (Bouk Decl. (Doc. 54-1) ¶ 6.)
Officer Smith, a Rowan County Sheriff's Deputy, was completing a
traffic stop nearby when he heard Officer Benfield's radio
transmission. (Smith Report (Doc. 58-7) at 1.) Officer Smith
also entered I-85 to assist and activated his emergency lights.
(Id. at 1-2.)

While the officers followed the Toyota with their emergency
lights activated, Deputy Benfield said over the radio that the
driver was a female and "appeared to be by herself." (Smith
Report (Doc. 58-7) at 2; see also Smith Video (Doc. 59-1)
at 8:31-8:55.) Smith pulled beside the Toyota and radioed that
the driver was an "older Black female" and was "holding up her
hands." (Smith Video (Doc. 59-1) at 9:14—9:38.)[2]

The vehicle that officers followed was a dark grey Toyota
Sequoia driven by Plaintiff Stephanie Bottom. (See Bottom Dep.
Excerpts ("Pl.'s Excerpts Bottom Dep.") (Doc. 58-1) at 3-4.)
Ms. Bottom, a 67-year-old librarian from Fulton County, Georgia,
was en route to her great-aunt's funeral. (Id. at 2, 4.)
Ms. Bottom was listening to loud music in her car and did not
notice that police were following her until Deputy Smith pulled

---

[2] Officer Smith's comments were audible in Officer
Benfield's vehicle and inaudible in Officer Bouk's. (Compare
Bouk In-Car Camera (Doc. 54-8) at 5:20-5:50, with Benfield BWC
(Doc. 54-10) at 5:14-5:42.)

up alongside her. (Id. at 9, 10–11.) Once Ms. Bottom realized the police were following her, she began looking for a safe place to pull over. (See id. at 11, 13.) Ms. Bottom feared the police would harm her because she is Black. (Id. at 11, 14.)

While Ms. Bottom's speed fluctuated above and below the speed limit, the pursuit never became a "high-speed chase." (See Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 17; Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 3–4.)[3] Nor did officers see Ms. Bottom throw anything from her vehicle. (Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 19; Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 4.)

The officers decided to deploy stop sticks to disable the vehicle. (Bouk Decl. (Doc. 54-1) at 3.) In the minutes before officers used stop sticks, Ms. Bottom moved from the far right lane to the far left lane of I-85. (Bouk In-Car Camera (Doc. 54-8) at 8:50–10:22.) Her first lane change appears to have been out of an exit only lane. (See id. at 9:41–10:12.) Ms. Bottom used her turn signal when making her first two lane changes, and the view of her blinkers in the video footage is blocked during the third lane change. (See id. at 9:41–9:52,

_____

[3] It appears Plaintiff's maximum speed was 80 miles per hour in a 70 mile per hour zone. (See Criminal Summons (Doc. 54-5) (citing Ms. Bottom for speeding 80 MPH).) There is no evidence that Plaintiff sped up after she noticed the police cars.

9:55–10:05.)[4] Officer Smith and State Trooper Freeze parked ahead of Ms. Bottom's position on I-85 and Officer Smith threw stop sticks in front of her vehicle as she passed. (Smith Report (Doc. 58-7) at 3; see also Smith Video (Doc. 59-1) at 12:20–14:05.) Approximately four minutes and thirty seconds elapsed between when Ms. Bottom realized police were following her and when the stop sticks punctured her tires. (See Smith Video (Doc. 59-1) at 9:30–14:00.) In total, Ms. Bottom drove for about ten to fourteen miles after officers began following her before hitting the stop sticks. (See, e.g., Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 25.)

After hitting the stop sticks, Ms. Bottom moved her car to the lefthand shoulder of I-85. (Bouk In-Car Camera (Doc. 54-8) at 10:10–10:30.) Officer Benfield parked behind Ms. Bottom's car, exited his vehicle, and approached the driver's side door with his firearm drawn. (Benfield BWC (Doc. 54-10) at 10:15–10:28.) Ms. Bottom held her hands out of the open window, (id.), which Officer Benfield interpreted to mean she was not holding a weapon. (Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 10–11.)

---

[4] Defendants characterize Ms. Bottom's lane changes as "evasive." (MSJ Br. (Doc. 55) at 6.) Viewed in the light most favorable to Plaintiff, a reasonable jury could conclude Plaintiff was changing lanes to avoid an exit lane and Officer Smith who was standing on the interstate. (Bouk In-Car Camera (Doc. 54-8) 9:45–10:22.) Additionally, signaling her lane changes to police suggests these maneuvers were not evasive.

Officer Benfield then holstered his weapon. (See Benfield BWC
(Doc. 54-10) at 10:25-10:28.)

As Officer Benfield approached the driver's door, Officers
Bouk and Barkalow parked behind Ms. Bottom's right rear bumper.
(See Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 6-7; Bouk In-Car
Camera (Doc. 54-8) at 10:27-10:40.) As they approached the front
passenger door, Officer Barkalow drew his firearm and pointed it
at Ms. Bottom and Officer Bouk drew his baton. (Pl.'s Excerpts
Bouk Dep. (Doc. 58-8) at 7; Bouk In-Car Camera (Doc. 54-8)
at 10:36-10:40.)

Officer Bouk opened the passenger side door and unbuckled
Ms. Bottom's seatbelt. (Pl.'s Excerpts Bouk Dep. (Doc. 58-8)
at 8-9; see also Bouk Video (Doc. 59-4) at 10:38-10:51.) At
approximately the same time, the driver's side door opened,[5] and
Officer Benfield stood in the door. (Benfield BWC (Doc. 54-10)
at 10:25-10:32.) The parties characterize what transpired next
differently.

In Officer Benfield's body camera footage, Officer Benfield
briefly places his hand on Ms. Bottom's arm and gestures for her
to exit the vehicle. (Benfield Video (Doc. 59-2) at 10:30-

_____

[5] Officer Barkalow does not recall whether he or Ms. Bottom
opened the door, (Pl.'s Excerpts Benfield Dep. (Doc. 58-3)
at 11), and Ms. Bottom's position on this fact is not in the
record.

- 7 -

10:35.) Ms. Bottom's seatbelt jumps, suggesting Officer Bouk had unfastened the buckle. (Id. at 10:33-10:36.) Ms. Bottom briefly looks at the officers on the passenger side and Officer Benfield grabs her left arm and appears to pull on her to exit the vehicle. (Id. at 10:34-10:37.) Ms. Bottom grasps the steering wheel with her right hand at the 12 o'clock, and then 10 o'clock, positions. (Id.) Suddenly, Officer Barkalow comes into frame, grabs Ms. Bottom's left arm in one hand and her hair in the other and forcefully pulls her from the vehicle and onto the ground. (Id. at 10:35-10:40.) The sound of sirens in the video drowns out any verbal exchange. (See id.) However, before Officer Barkalow pulled Ms. Bottom from the vehicle, she heard officers tell her to exit the vehicle. (See Bouk Decl. (Doc. 54-1) ¶ 11; see also Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 24 ("Q. . . . Do you remember at the time hearing, "Get out of the car?" A. Yes.").)

After officers pulled Ms. Bottom from the vehicle, there was a brief struggle on the ground as they handcuffed her behind her back. (See Barkalow Video (Doc. 59-3) at 10:53-11:15; see also Benfield Video (Doc. 53-2) at 10:38-10:59.)[6] In the video,

―――――――――

[6] As Officers Benfield and Barkalow were handcuffing Ms. Bottom, other officers arrived to assist. (See Benfield BWC (Doc. 54-10) at 10:37-11:30; see also Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 17 (identifying State Trooper Freeze as present in the body worn camera footage).)

Ms. Bottom's left arm appears tense for a few moments, and she tucked her right arm under her body. (See Barkalow Video (Doc. 59-3) at 10:53–11:15; Benfield Video (Doc. 59-2) at 10:38–10:59; Defs.' Excerpts Bottom Dep. (Doc. 54-6) 3–4.)

In the video footage, while handcuffing Ms. Bottom, Officer Barkalow tries to pull her left arm behind her back. (Barkalow Video (Doc. 59-3) at 10:50–11:10.) In doing so, he pushes down on her left shoulder blade as he pulls the arm behind her and bends it at the elbow.[7] (Id. at 10:58–11:06.) Plaintiff testified this action dislocated her shoulder. (Compare Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 17, with Bouk Video (Doc. 59-4) at 11:00–11:10.)

After officers pulled Ms. Bottom to the ground, it took them approximately twenty seconds to pin her arms behind her. (See Barkalow Video (Doc. 59-3) at 10:53–11:15; see also Benfield Video (Doc. 59-2) at 10:38–10:59.) Once Ms. Bottom's

---

[7] Plaintiff's response states that "[w]hile Barkalow pulled Bottom's hand around to be handcuffed, Bouk pulled her left arm into the air, lifting it away from her back. As the Defendants pulled her in this way, Bottom heard her shoulder pop and become dislocated." (MSJ Resp. (Doc. 58) at 11 (citations omitted).) However, Plaintiff testified that Officer Barkalow, not Officer Bouk, dislocated her shoulder; Plaintiff testified that her shoulder was dislocated between 11:04 and 11:06. (Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 17.) However, per Officer Bouk's body worn camera footage he first put his hands on Ms. Bottom at approximately 11:07. (See Bouk Video (Doc. 59-4) at 11:00–11:10.)

hands were behind her back, it took officers a few more seconds to fasten the handcuffs. (See Barkalow Video (Doc. 59-3) at 10:58–11:15.) Officer Benfield's body camera footage shows Ms. Bottom screaming in apparent pain. (Benfield Video (Doc. 59-2) at 10:38–10:59.)

According to Officer Barkalow, he saw Officer Benfield pull on Ms. Bottom's arm and tell her to exit the vehicle. (Barkalow Decl. (Doc. 54-2) ¶ 11.) Officer Barkalow then "ran around to the driver's side to assist Benfield." (Id.)[8] As Officer Barkalow approached the driver's door, he saw Ms. Bottom's hand on the steering wheel and thought she was pulling against Officer Benfield. (See id. ¶ 12.) When Officer Barkalow "reached the open driver's door, [he] immediately took hold of Bottom's left wrist with [his] left hand, while simultaneously grabbing her hair with [his] right hand." (Id. ¶ 13.)

Officer Benfield perceived the situation differently. He did not ask Officer Barkalow for help and did not see Officer

---

[8] This court is skeptical whether Officer Barkalow saw Officer Benfield pull on Ms. Bottom's arm before he ran around the vehicle. (See Barkalow Decl. (Doc. 54-2) ¶ 11.) It took Officer Barkalow four seconds to run from the passenger side of the Toyota to the driver's side where he "immediately" pulled Ms. Bottom out by her hair. (See Barkalow Video (Doc. 59-3) at 10:47–10:51; see also Barkalow Decl. (Doc. 54-2) ¶ 13.) However, four seconds prior to Officer Barkalow arriving at the driver's door, Officer Benfield had yet to grab Plaintiff's arm. (See Benfield Video (Doc. 59-2) at 10:29–10:37.)

Barkalow approach the driver's door. (See Pl.'s Excerpts
Benfield Dep. (Doc. 58-3) at 13-14.) Upon arriving at the
driver's door, Officer Barkalow pushed Officer Benfield into the
driver's side door with his body to grab Ms. Bottom and pull her
from the vehicle. (Id.) Officer Benfield agreed fifteen seconds
elapsed from when he exited his vehicle to the moment Officer
Barkalow pulled Ms. Bottom out by her hair. (Id. at 14.)[9]
Moreover, Officer Benfield testified that he believed he could
have talked Ms. Bottom out of her vehicle if Officer Barkalow
had waited ten to fifteen more seconds to intervene. (Id.
at 23-24.) Officer Benfield also testified that, in his opinion,
it was not reasonable for Officer Barkalow to pull Plaintiff out
of the vehicle by her hair. (Id. at 24-25.)

According to Ms. Bottom, when she exited her car, she
placed her right hand on her steering wheel to brace herself as
she turned her body to the left. (Pl.'s Excerpts Bottom Dep.
(Doc. 58-1) at 26, 43-44.) Ms. Bottom stated that, during the
encounter, she was in the process of exiting her vehicle even
before Officer Benfield began pulling on her arm. (Id. at 44.)

---

[9] This court adds that approximately two seconds elapsed
from the time Ms. Bottom's seatbelt was unfastened to the moment
Officer Barkalow pulled her out by her hair. (See Benfield Video
(Doc. 59-2) at 10:34-10:39.)

After Ms. Bottom was handcuffed, she repeatedly asked the officers what she had done wrong, answered their questions about her name, and told them where to find her driver's license. (See Benfield Video (Doc. 59-2) at 11:19–13:45.) Plaintiff repeatedly cried out that the handcuffs hurt her shoulder. (See id. at 13:05–15:49; see also Barkalow Video (Doc. 59-3) at 13:08–16:05.) Officers eventually removed the handcuffs, helped Ms. Bottom stand up, and refastened the handcuffs in front of her body. (See Barkalow Video (Doc. 59-3) at 13:08–16:05.)

Later, after the officers walked away from Ms. Bottom, Officer Barkalow said he had gotten a "handful of dreads." (Bouk BWC (Doc. 54-11) at 24:30–25:10.) Officer Benfield responded that he was "trying to do it calmly." (Id.) Officer Barkalow replied that he had seen Ms. Bottom pulling against Officer Benfield and that "at that point she'd earned it." (Id.) These statements were about the officers' use of force. (See Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 24–25.)

Following Ms. Bottom's traffic stop, officers with the Salisbury Police and Rowan County Sheriff's Office completed use of force reports. (See Salisbury Use of Force Report (Doc. 58-9); Rowan Use of Force Report (Doc. 58-10).) Officer

Barkalow drafted the Salisbury report, and his supervisors reviewed it. (Salisbury Use of Force Report (Doc. 58-9) at 1, 57.) One reviewer concluded that "[w]hen Det. Barkalow engaged contact with [Ms. Bottom] she was already in the motion of exiting the vehicle with the assistance of Deputy Benfield." (Id. at 5–6.) Notwithstanding that conclusion, Officer Barkalow's reviewers agreed that his use of force during the incident was "reasonable and necessary." (See id. at 5–7.) Officer Bouk also agreed with Officer Barkalow's decision to pull Plaintiff from the vehicle and said he would have done the same in Officer Barkalow's position. (Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 20–21.)

The Rowan County Sheriff's Office disagreed. Major Wyrick, who reviewed the use of force, determined "that had [Officer] Benfield been afforded the opportunity to talk [Ms. Bottom] out of the vehicle a little longer she would have eventually complied. The . . . force [Officer Barkalow] used . . . would have been greater force [than] necessary to handle the situation given the circumstances." (Rowan Use of Force Report (Doc. 58-10) at 7.) Rowan County Sheriff Kevin Auten agreed with Major Wyrick that Officer Barkalow used more force than necessary. (Auten Dep. Excerpts (Doc. 58-11) at 2–3.)

Ms. Bottom was arrested for failure to heed blue lights and siren, (Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 20), a misdemeanor offense. See N.C. Gen. Stat. § 20-157. A lieutenant with the Rowan County Sheriff's Office decided to release Ms. Bottom to EMS custody and to serve a summons on her at the hospital. (Id. at 20-22.) A summons was issued for speeding, failure to heed blue lights and siren, and resisting a public officer. (See Summons (Doc. 58-2).) Ms. Bottom pleaded guilty to failure to heed blue lights and siren; in exchange, the other charges were dropped. (Defs.' Excerpts Bottom Dep. (Doc. 54-6) at 5.)

Prior to the traffic stop, Ms. Bottom's rotator cuff was injured in an unrelated car accident; the force used during the traffic stop exacerbated her injury. (See Defs.' Excerpts Bottom Dep. (Doc. 54-6) at 6; Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 29, 48; Dr. Kane Decl. (Doc. 58-13) ¶¶ 5-6.) When officers handcuffed Ms. Bottom, they dislocated her shoulder and tore her rotator cuff. (Compare Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 16-17, 28, with Barkalow Video (Doc. 59-3) at 11:00-11:15; see also Dr. Kane Decl. (Doc. 58-13).) Ultimately, Ms. Bottom needed surgery to repair the damage. (Dr. Kane Decl. (Doc. 58-13) ¶ 6.) Even after surgery, Ms. Bottom struggles to use her left arm for bathing and styling her hair, which led her

- 14 -

to shave off her hair and begin wearing wigs. (Pl.'s Excerpts
Bottom Dep. (Doc. 58-1) at 32.) Additionally, Ms. Bottom still
has flashbacks to the incident. (Id.)

### A.    Officer Bouk's Search

After Ms. Bottom was handcuffed, Officer Bouk said "nice,
nice, I'm gonna get some gloves and look inside that car." (Bouk
BWC (Doc. 54-11) at 12:10-12:14.) Officer Bouk opened the
driver's side door, took a black object out of the door
compartment, held it briefly, put it back, and closed the door.
(Id. at 13:09-13:27.) Later, while searching Ms. Bottom's
pockets, Officer Bouk found cash and opened the driver's door to
put it in her purse. (Bouk BWC (Doc. 54-11) at 16:40-17:25.)
Officer Bouk then proceeded to search the purse. (Id. at 17:25-
21:25.) Ms. Bottom asked why he was searching her purse, and he
responded that he was "searching it before it goes with you" to
make sure there are no "weapons or drugs." (Id. at 19:50-20:10.)
He added that she could not take her cigarettes or lighter with
her to the jail and that he would leave them in the car. (Id. at
20:09-20:19.) Officer Bouk then put the purse on Officer
Benfield's car. (Id. at 22:30-22:25.)

### II.  PROCEDURAL HISTORY

Plaintiff filed her complaint on April 21, 2021. (Doc. 1.)
Prior to the instant motion, Plaintiff voluntarily dismissed

- 15 -

several Defendants. (Doc. 53.) The remaining Defendants filed a
Motion for Summary Judgment asking this court to dismiss all of
Plaintiff's claims, (Defs.' Mot. for Summ. J. (Doc. 54)), and a
brief in support of their motion, (Defs.' Mem. of Law in Supp.
of Mot. for Summ. J. ("MSJ Br.") (Doc. 55)). Plaintiff
responded. (Pl.'s Resp. to Defs.' Mot. for Summ. J. ("MSJ
Resp.") (Doc. 58).) Defendants replied. (Defs.' Reply to Pl.'s
Opp'n to Mot. for Summ. J. ("MSJ Reply") (Doc. 61).) Defendants'
motion is now ripe for adjudication.

## III. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). This court's
summary judgment inquiry is whether the evidence "is so one-
sided that one party must prevail as a matter of law." <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). The moving
party bears the initial burden of demonstrating "that there is
an absence of evidence to support the nonmoving party's case."
<u>Celotex Corp.</u>, 477 U.S. at 325. If the "moving party discharges
its burden . . ., the nonmoving party must come forward with
specific facts showing that there is a genuine issue for trial."
<u>McLean v. Patten Cmtys., Inc.</u>, 332 F.3d 714, 719 (4th Cir. 2003)

(citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475
U.S. 574, 586-87 (1986)). Summary judgment should be granted
"unless a reasonable jury could return a verdict in favor of the
nonmovant on the evidence presented." <u>McLean</u>, 332 F.3d at 719
(citing <u>Liberty Lobby</u>, 477 U.S. at 247-48).

## IV.  <u>ANALYSIS</u>

Plaintiff asserts six claims: (1) an excessive force and
unreasonable search claim against Individual Defendants; (2) a
<u>Monell</u> claim against the City of Salisbury for a policy practice
or condonation of excessive force; (3) a racial profiling/
discrimination and selective enforcement claim against
Individual Defendants; (4) a <u>Monell</u> claim against the City of
Salisbury for a pattern and practice of racially discriminatory
use of force; (5) an assault and battery claim against
Individual Defendants; and (6) a claim for statutory action on
surety bond. (<u>See</u> SAC (Doc. 44) at 15-24.)

Defendants seek summary judgment on each claim. (<u>See</u> MSJ
(Doc. 54) at 1.) This court will grant Defendants' motion as to
the excessive force and assault and battery claims against
Officer Bouk, the racial profiling claim, and the claim for
statutory action on surety bond. This court will deny
Defendants' motion as to the excessive force and assault and

battery claims against Officer Barkalow, the unreasonable search claim, and the <u>Monell</u> claims.

## A. **<u>Selective Enforcement Claim</u>**

Plaintiff alleges that Individual Defendants, Officers Bouk and Barkalow, stopped her after "racially profiling her as a drug courier." (MSJ Resp. (Doc. 58) at 17.) Defendants argue this claim must fail because there is no evidence Officers Bouk and Barkalow "targeted Bottom for a traffic stop in the first place." (MSJ Br. (Doc. 55) at 19.) This court agrees with Defendants.

The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996). "To avoid summary judgment, the burden is on the § 1983 plaintiff 'challenging alleged racial discrimination in traffic stops and arrests' to 'present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.'" <u>Martin v. Connor</u>, 882 F. Supp. 2d 820

(D. Md. 2012).[10] There is no evidence that Officers Bouk and Barkalow were "involved" in the decision to arrest Ms. Bottom. See id. Therefore, Plaintiff's claim must fail.

Ms. Bottom's vehicle was first flagged by Officer Hampton using a Lidar device. (See Benfield Incident Report (Doc. 54-4) at 3 (explaining that Officer Hampton notified Officer Benfield of a speeding Toyota).) Officer Hampton identified an "SUV in the number one lane, looks like a Toyota gold in color" driving "80 [miles per hour] at 934 feet." (Smith Video (Doc. 59-1) at 2:20-2:30.)[11] Officer Hampton did not state the driver's race. (See id.) Officer Benfield pursued the Toyota and activated his

---

[10] The Fourth Circuit has not "squarely addressed the elements of a § 1983 claim of racial discrimination in regard to a traffic stop." See Ogunsula v. Maryland State Police, No. ELH-20-2568, 2021 WL 6105503, at *29 (D. Md. Dec. 23, 2021), reconsideration denied, No. ELH-20-2568, 2022 WL 3290713 (D. Md. Aug. 11, 2022). However, other courts have looked to Martin, 882 F. Supp. 2d 820, in analyzing the issue. See, e.g., Ogunsula 2021 WL 6105503 at *29-31; Leftridge v. Matthews, No. ELH-11-3499, 2013 WL 5467724, at *21 (D. Md. Sept. 30, 2013), aff'd sub nom. Leftridge v. Doe, 565 F. App'x 231 (4th Cir. 2014); Johnson v. Holmes, No. 3:16CV00016, 2017 WL 4707463, at *6 (W.D. Va. Oct. 19, 2017).

[11] Ms. Bottom argues that because Officer Hampton said the speeding car was gold and her car was dark gray that Officer Benfield's decision to stop her was illegitimate. (MSJ Resp. (Doc. 58) at 19.) However, Officer Benfield testified that there were no other vehicles between him and Ms. Bottom when Officer Hampton called out her car, and there is no contrary evidence in the record. (See Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 30.) Therefore, there is no evidence Officer Benfield stopped the wrong car.

- 19 -

emergency lights to perform a traffic stop. (See Benfield
Incident Report (Doc. 54-4) 3-4.) When the car failed to stop,
Officer Benfield informed other officers via radio, and Officers
Bouk and Barkalow, joined the pursuit. (Bouk Decl. (Doc. 54-1)
¶ 6.)

Based on these undisputed facts, Officers Bouk and Barkalow
did not decide to stop Ms. Bottom. So, even if they were aware
of Ms. Bottom's race before Officer Benfield initiated the
traffic stop (and there is no evidence they were aware), they
could not have "targeted" her based on this information.

Ms. Bottom points to several facts that she claims
demonstrate racial animus motivated her arrest. (See MSJ Resp.
(Doc. 58) at 17-20.) However, none of Plaintiff's arguments
address the dispositive fact that Individual Defendants did not
initiate the traffic stop.[12] Instead, they responded to another
officer's call concerning a vehicle that failed to stop in
response to emergency lights. Thus, this court will grant
Defendants' motion for summary judgment as to Plaintiff's
selective enforcement claim.

---

[12] Plaintiff's expert claims the entire operation was a drug
interdiction effort, not a speed campaign. (See Taylor Dep.
Excerpts (Doc. 58-6) at 7.) This claim does not change the fact
that Individual Defendants in this action — Officers Bouk and
Barkalow — did not make the initial decision to stop Ms. Bottom.

**B.** __Excessive Force Claim__

Ms. Bottom contends that Officers Barkalow and Bouk used excessive force and that they are not entitled to qualified immunity because the law on this issue was clearly established at the time. (See MSJ Resp. (Doc. 58) at 20-26.) Defendants contend they did not use excessive force, and, in any event, they are entitled to qualified immunity. (MSJ Br. (Doc. 55) at 20-22.) This court concludes Officer Barkalow used excessive force, and the unlawfulness of his actions was clearly established. Conversely, Officer Bouk's more limited use of force does not constitute a constitutional deprivation, and clearly established law did not proscribe his conduct.

"The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest." Livingston v. Kehagias, 803 F. App'x 673, 683 (4th Cir. 2020) (unpublished) (quoting Harris v. Pittman, 927 F.3d 266, 272 (4th Cir. 2019). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight." Id. "The
calculus of reasonableness must embody allowance for the fact
that police officers are often forced to make split-second
judgments — in circumstances that are tense, uncertain, and
rapidly evolving — about the amount of force that is necessary
in a particular situation." Id. "[T]he 'reasonableness' inquiry
in an excessive force case is an objective one: the question is
whether the officers' actions are 'objectively reasonable' in
light of the facts and circumstances confronting them, without
regard to their underlying intent or motivation." Id.

"In assessing whether an officer's actions were objectively
reasonable, 'we weigh the nature and quality of the intrusion on
the individual's Fourth Amendment interests against the
countervailing governmental interests at stake.'" Turmon v.
Jordan, 405 F.3d 202, 207 (4th Cir. 2005) (citing Jones v.
Buchanan, 325 F.3d 520, 527 (4th Cir. 2005))."[W]hether a use of
force is excessive is an objective inquiry, based on the factors
set out in Graham v. Connor: '[1] the severity of the crime at
issue, [2] whether the suspect poses an immediate threat to the
safety of the officers or others, and [3] whether the suspect is
actively resisting arrest or attempting to evade arrest by
flight.'" Livingston, 803 F. App'x at 683 (quoting Graham, 490

U.S. at 396). The extent of any injuries suffered by the plaintiff is also relevant. Jones, 325 F.3d at 527.

In determining whether the force used was reasonable, "we must 'view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.'" Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (citing Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005)).

While Defendants separate the use of force into "the pointing of guns," "the decision to pull Bottom from her vehicle," "Barkalow's use of the hair pull," and "the force used to handcuff Bottom," (see MSJ Br. (Doc. 55) at 11–16), "artificial[ly] divi[ding]" the encounter in this way "do[es] not aid [this] court's evaluation of objective reasonableness." Smith, 781 F.3d at 101. In evaluating the use of force, this court considers the entire encounter.

While it is improper to divide the event temporally, this court will consider the actions of the Individual Defendants separately. Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021) ("When multiple officers seek to invoke qualified immunity, we separately consider each officer's actions."); Meadours v. Ermel, 483 F.3d 417, 421 (5th Cir. 2007) (holding

- 23 -

the district court erred in considering the officers' actions together and instructing the district court to consider the actions separately on remand).

### 1. The Graham Factors

Regarding the first Graham factor, the severity of the suspected crime, Individual Defendants had probable cause to believe Plaintiff was speeding ten miles over the speed limit and that she had failed to heed blue lights and siren.[13] These offenses are "not of the type that would give an officer any reason to believe that [Ms. Bottom] was a potentially dangerous individual." Smith, 781 F.3d at 102. Given the minor offenses that police suspected Plaintiff had committed, this factor weighs in Plaintiff's favor.

The second Graham factor is "whether the suspect poses an immediate threat to the safety of the officers or others." 490 U.S. at 396. This factor is mixed on the record. Several facts weigh in Plaintiff's favor. Plaintiff is an older woman, a fact Officers knew as they approached her. (See Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 22.) Plaintiff did not threaten or attempt to strike anyone. (Id. at 20-21.) Officers had no information that Plaintiff was armed. (Id. at 27; Pl.'s Excerpts

---

[13] Failure to heed is a nonviolent misdemeanor. See N.C. Gen. Stat. § 20-157.

Benfield Dep. (Doc. 58-3) at 9.) When Plaintiff held her hands outside of the car window, Officer Benfield construed the gesture to mean she was not holding a weapon. (Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 10.) Major Wyrick concluded Ms. Bottom "showed no immediate physical threat to the officers even though she refused to adhere to their commands to get out of the vehicle." (Rowan Use of Force Report (Doc. 58-10) at 7.)

However, two facts weigh in Defendants' favor. First, there is no dispute that officers were confronting a driver who had failed to stop for blue lights for an extended period and did not stop until her tires were punctured. Relatedly, Ms. Bottom's vehicle was still running, (see Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 8-9), suggesting the possibility of further flight or possible injury should Plaintiff accelerate. Whatever

the cause of Ms. Bottom's failure to stop, as the officers approached, they faced a potential risk to their safety.[14]

Although Officer Barkalow stated in his deposition that the stop sticks had "disabled" the vehicle, (Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 21), Plaintiff was able to drive her car to the shoulder after the stop sticks were deployed. (Bouk In-Car Camera (Doc. 54-8) 10:05–10:30.) Thus, while Plaintiff remained in the driver's seat, this factor weighs in Defendants' favor. After Plaintiff was removed from the vehicle, this factor weighs in Plaintiff's favor.

---

[14] Other courts analyzing force used in traffic stops have concluded this factor weighed in the officers' favor even where the plaintiff did not behave aggressively or suspiciously. See Coffey v. Morris, 401 F. Supp. 2d 542, 548 (W.D. Va. 2005) (finding a passenger "posed an immediate threat" to the officer's safety when she failed to heed his order to remain in her car that was parked in the driveway of her home); Cleary v. Green, No. CCB-07-1202, 2008 WL 4900548, at *5 (D. Md. Nov. 6, 2008) (finding that the second Graham factor weighed in the officers' favor when the plaintiff questioned an officer's order to exit her vehicle). However, courts have also been mindful that where a particular driver's actions do not provide "an objectively reasonable basis" for the officer to assume they "pose[] an immediate threat to the officer's safety," "the general absence of knowledge [about the driver] concomitant with any given encounter" does not automatically create a risk to the officer's safety. Wilson v. Painter, No. 3:20CV645 (DJN), 2020 WL 7497801, at *11 n.11 (E.D. Va. Dec. 21, 2020), aff'd, No. 21-1083, 2021 WL 5851070 (4th Cir. Dec. 9, 2021). Regardless, in this case, Ms. Bottom's failure to heed blue lights and her position behind the wheel of a running vehicle provided "an objectively reasonable basis" for officers to assume there was a risk to their safety beyond the usual risks "concomitant with any given [traffic] encounter." See id.

The third Graham factor is whether the individual "is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Ms. Bottom arguably resisted or attempted to evade police during three parts of her encounter with law enforcement.

First, Ms. Bottom arguably attempted to evade arrest when she failed to stop in response to blue lights and sirens. Ms. Bottom stated she failed to quickly pull over because she initially did not notice the police cars behind her. (See Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 9-13.) Once she noticed them, she did not have time to find a safe place to pull over before officers deployed stop sticks approximately four and a half minutes later. (See id.; Smith Video (Doc. 59-1) at 9:30-14:00.)

Ms. Bottom's driving would not suggest to a reasonable officer that she was attempting to evade arrest. There is no evidence Ms. Bottom's speed, which varied above and below the speed limit, (see Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 18), was ever more than 10 miles over the posted speed limit — the speed at which she was initially clocked before officers began following her. (See Criminal Summons (Doc. 54-5) (citing Ms. Bottom for speeding 80 miles per hour in a 70 mile per hour zone); see also Smith Video (Doc. 59-1) at 2:20-2:30.)

Additionally, the dash camera footage appears to show Plaintiff using her turn signal when changing lanes. (Bouk In-Car Camera (Doc. 54-8) at 9:41–9:52, 9:55–10:05.) A reasonable jury could find that Ms. Bottom was not actively evading police since she broadcast her lane changes to them and made no efforts to speed away or otherwise escape from police. However, a reasonable jury could also find Plaintiff's failure to stop was sufficiently unusual to heighten a reasonable officer's concern.

Ms. Bottom next arguably resisted officers by failing to immediately exit her vehicle. However, Ms. Bottom only had eight seconds to exit her vehicle from the time her door was opened and two seconds to exit her vehicle from the moment her seatbelt was unfastened. (Benfield Video (Doc. 59-2) at 10:20–10:40 (per Officer Benfield's body camera footage, at 10:22 he exits his cruiser, at 10:29 he opens the driver's side door, at 10:34 he briefly places his hand on Ms. Bottom's wrist, at 10:35 Officer Bouk releases Ms. Bottom's seatbelt and she grasps the steering wheel, and at 10:37 Officer Barkalow pulls Plaintiff from the car by her hair).) A court in the Eastern District of Virginia found that permitting a motorist fifteen seconds to exit before punching a driver in the face could plausibly be considered "too much force too quickly." Wilson, 2020 WL 7497801, at *11. The instant facts — where Ms. Bottom was provided less time to

- 28 -

comply and Officer Barkalow arguably used greater force —
suggest the same conclusion. A genuine issue of material fact
exists as to whether Ms. Bottom's failure (or inability) to exit
her vehicle on this timeline is active resistance or a
reasonable effort to comply with the officers' instructions. The
fact that Ms. Bottom grasped her steering wheel does not alter
this conclusion.

As Ms. Bottom grasps her steering wheel, she does appear to
pull back somewhat against Officer Benfield's hold on her left
arm. (See Benfield Video (Doc. 59-2) at 10:33–10:37.) Two
seconds later, Officer Barkalow pulls Ms. Bottom from her
vehicle by her hair. (See id.) The Fourth Circuit has made clear
that "a reasonable officer could not believe that the 'initial
act of pulling one's arm away' when an officer grabs a person
'without warning or explanation' justifies the officer's
decision to throw the person to the ground." Hupp v. Cook, 931
F.3d 307, 323 (4th Cir. 2019) (cleaned up). This is particularly
notable in light of Officer Benfield's statement that he thought
he could talk Plaintiff into exiting the car. (See Pl.'s
Excerpts Benfield Dep. (Doc. 58-3) at 23–24.)

The last arguably evasive maneuver was when Ms. Bottom was
being handcuffed. After Ms. Bottom was taken to the ground,
Officers Benfield and Barkalow immediately began attempting to

- 29 -

handcuff her, they were soon joined by Officers Bouk and Freeze. (See Bouk Video (Doc. 59-4) at 10:50–11:30; Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 17.) Ms. Bottom tucked her right arm under her body and was not perfectly compliant with officers' attempts to put her in handcuffs. (See Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 20–23.) Though it took the officers about twenty seconds to pin Ms. Bottom's hands behind her back, the extent of her resistance appears to be "refusing to give up [her] hands for handcuffs," which the Fourth Circuit has identified as passive, not active, resistance. Livingston, 803 F. App'x at 684. Thus, the third Graham factor favors Ms. Bottom.

Ms. Bottom's injuries are also relevant to the excessive force analysis. Jones, 325 F.3d at 531. "An efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force." Pegg v. Herrnberger, 845 F.3d 112, 120 (4th Cir. 2017). Conversely, when, as here, the plaintiff suffers severe injuries, this element weighs in the plaintiff's favor. Jones, 325 F.3d at 530–31. Defendants attempt to mitigate their responsibility for Ms. Bottom's injuries by noting that she had an existing shoulder injury and the present injury occurred

during handcuffing, a standard police procedure. (See MSJ Br. (Doc. 55) at 15-16.)

In Jones, the Fourth Circuit deemed the plaintiff's injuries "severe" when he experienced "a nose crushed into numerous pieces, lacerations of the nose and lips, each requiring multiple sutures, and bruised ribs." 325 F.3d at 530. This court finds that Ms. Bottom's injury — a dislocated shoulder and torn rotator cuff which required surgery and has failed to fully heal in the intervening four years — was similarly severe. That Ms. Bottom's injuries may have been less severe had she not been injured in a prior car accident does not undermine this finding. Ms. Bottom "has at least raised an issue of fact as to whether the extent of [her] injuries are indicative of excessive force." Turmon, 405 F.3d at 207. The fact that the use of force exacerbated an existing injury does not prevent this court from concluding, at the summary judgment stage, that Ms. Bottom's injuries were severe.

Defendants also note that the injury occurred while handcuffing Ms. Bottom. (MSJ Br. (Doc. 55) at 16.) Handcuffing is a "standard procedure . . . [that] rarely constitute[s] excessive force where the officers were justified, as here, in effecting the underlying arrest." Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002). While handcuffing is generally

- 31 -

permissible, a reasonable jury could find that the use of force as a whole (approaching with drawn firearms and almost immediately pulling Ms. Bottom from the vehicle by her hair) created a stressful and frightening environment where more force was needed to secure the handcuffs. Thus, this court finds this factor weighs in Ms. Bottom's favor.

Having evaluated the Graham factors, this court must also consider the "intrusion" into Ms. Bottom's "Fourth Amendment interests" — the force officers used against her. See Turmon, 405 F.3d at 207) (citing Jones, 325 F.3d at 527). Officer Barkalow approached the vehicle with his gun drawn, pulled Ms. Bottom out by her hair, and, while applying handcuffs, dislocated Ms. Bottom's shoulder and tore her rotator cuff. Officer Bouk approached the vehicle armed with a baton, unbuckled Plaintiff's seatbelt, and helped handcuff Ms. Bottom. This court will analyze the officers' conduct separately in determining whether they violated Plaintiff's constitutional rights and whether they are entitled to qualified immunity.

### 2. Officer Barkalow's Use of Force

The parties dispute whether Officer Barkalow's use of force was objectively reasonable. (Compare MSJ Br. (Doc. 55) at 10-17, with (MSJ Resp. (Doc. 58) at 20-21.) "Because 'police officers are often forced to make split-second judgments — in

- 32 -

circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." Waterman, 393 F.3d at 476–77 (internal citations omitted). "In this case, we need not use hindsight or conjure up a pseudo-'reasonable officer' because, two other presumably 'reasonable officers' were at the scene." Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008).

Officer Benfield assumed primary responsibility for pursuing and arresting Plaintiff. (Benfield Incident Report (Doc. 54-4) at 4 (describing Officer Bouk's vehicle as the "secondary unit in the pursuit" and adding that Officer "Smith was following behind to assist as well"); see also Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 16 (describing Benfield's vehicle as the "primary vehicle").) Officer Benfield first attempted to stop Plaintiff for speeding, he pursued her longer than other officers, and, standing at the driver's door, he was in the best position to assess any risk Plaintiff may have posed and whether force was needed to remove her from the vehicle. From the available facts, Officer Benfield decided to pull Ms. Bottom's arm to encourage her to exit. Officer Benfield concluded his strategy would get Ms. Bottom to exit the vehicle

within ten to fifteen seconds. (Pl.'s Excerpts Benfield Dep. (Doc. 58-3) at 23-24.)

In contrast, Officer Barkalow stood on the passenger side of the vehicle somewhere behind Officer Bouk. (See Bouk Video (Doc. 59-4) at 10:39-10:52.) He observed Officer Benfield's interactions with Ms. Bottom for about four seconds before he ran around the car. (Id.) As he ran, his view of Ms. Bottom and Officer Benfield may have been partially obstructed by the vehicle. (Id.) When he reached Officer Benfield and Ms. Bottom, he "immediately" pulled Ms. Bottom from the vehicle by her hair. (See id.; see also Barkalow Decl. (Doc. 54-2) ¶ 13.)

A reasonable officer in the situation would have known, as Officer Benfield did, that it was unnecessary to forcefully pull an older woman from the vehicle by her hair onto the ground after providing her mere seconds to comply with orders to exit. Additionally, it should have been obvious to a reasonable officer that Officer Benfield was in the best position to assess what force was needed to safely remove Ms. Bottom from her vehicle. A reasonable officer would have deferred to Officer Benfield's decision. Officer Barkalow unreasonably decided to substitute his own, less informed, judgment for Officer Benfield's and to physically push Officer Benfield out of the way to extract Ms. Bottom.

As Defendants note, other courts have found that uses of force similar to or greater than what Officer Barkalow employed here were not excessive where police were arresting a suspect following a pursuit. (See MSJ Br. (Doc. 55) at 13, 15; MSJ Reply (Doc. 61) at 15.) However, in each case Defendants cite, officers reasonably believed the suspect was highly dangerous.[15] Though Ms. Bottom posed some risk to officers, she posed far less risk than the plaintiffs in the cases Defendants cite. As such, those cases are not persuasive for analyzing what force was appropriate in this case.

---

[15] In Dalton v. Liles, the plaintiff "was a suspect in a home invasion . . . had multiple outstanding Virginia arrest warrants" and his "family had told RCSO officers that [he] was in possession of several shotguns and pistols and would 'shoot it out' with law enforcement." No. 5:19-CV-00083-MR, 2021 WL 3493150, at *2 (W.D.N.C. Aug. 9, 2021). The plaintiff also led officers on a "high-speed chase," wrecked one car and stole another. Id. at *2-3. Similarly, in Hennings v. Milone, the plaintiff's "car matched one just seen in an armed robbery, [the plaintiff] led police on a high-speed car chase" and "was arrested after crashing his car, injuring several people, and trying to flee on foot." No. 21-1533, 2021 WL 5412336, at *1 (7th Cir. 2021). Finally, in Martin v. Gentile, the plaintiff was "a suspect in a series of remarkably similar violent rapes and [police] obtained a warrant for his arrest. Because the rapist had used a large knife in the commission of his crimes and cut several of his victims, the detectives were concerned that Martin would be armed and dangerous and likely to resist arrest. This conclusion was bolstered by the fact that Martin had a previous conviction for attempted robbery, a previous arrest for assault with a switchblade, and was believed to have some training in the martial arts." 849 F.2d 863, 865 (4th Cir. 1988).

Three cases guide this court's conclusion that Plaintiff's evidence is sufficient to create an issue of fact on whether Officer Barkalow used excessive force. In Young v. Prince George's County, the Fourth Circuit emphasized the proportionality requirement of the excessive force analysis. 355 F.3d 751, 757 (4th Cir. 2004). The court explained, "[t]he fact that a suspect is armed . . . does not render all force used by an officer reasonable. The measures taken by an officer to disarm a suspect must be reasonable under the totality of the circumstances." Id. Simply because a suspect poses some threat to officers, that does not justify all force an officer could use to subdue the suspect. The force must be proportional considering the "totality of the circumstances." See id. Here, the totality of the circumstances indicated that, while officers faced some risk, Ms. Bottom did not make threats and only passively resisted them.

Second, in Hupp v. Cook, the Fourth Circuit explained "that a reasonable officer could not believe that the 'initial act of pulling one's arm away' when an officer grabs a person 'without warning or explanation' justifies the officer's decision to throw the person to the ground." 931 F.3d at 323 (cleaned up). Even if Officer Barkalow saw Ms. Bottom pull against Officer Benfield's grasp, that did not permit Officer Barkalow to

Case 1:21-cv-00322-WO-JEP   Document 71   Filed 08/14/23   Page 36 of 58

immediately pull her from the vehicle by her hair and to the ground.

Finally, in <u>Wilson v. Painter</u>, a driver failed to exit his vehicle during a traffic stop within fifteen seconds despite the officer's requests to do so. 2020 WL 7497801, at *2. The officer began pulling the driver from the vehicle and then punched the driver in the face to secure his compliance. <u>See id.</u> The court found the driver "plausibly allege[d] that [the officer] used too much force too quickly." <u>Id.</u> at *11. Here, Plaintiff was given even less time to exit her vehicle and Officer Barkalow arguably responded with more force by throwing her from the vehicle onto the ground.

Therefore, considering the evidence in the light most favorable to Plaintiff, this court cannot conclude Officer Barkalow's use of force was not excessive as a matter of law.

### 3. <u>Officer Barkalow is not entitled to qualified immunity</u>

When subject to suit under § 1983, state and local officials may assert qualified immunity to shield them "from liability for civil damages[,] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In deciding whether a

- 37 -

government official is entitled to qualified immunity, this court must determine whether there was a violation of a person's constitutional rights and then analyze whether the right was "clearly established" such that a reasonable officer would know "that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). The doctrine of "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (internal citation omitted). "Although earlier cases involving fundamentally similar or materially similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Jones, 325 F.3d at 531 (internal quotation marks and citation omitted).

As Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure was violated, this court must

determine if a reasonable officer would have been on notice that Officer Barkalow's actions were excessive. See Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009) (citing Harlow, 457 U.S. at 818).

This court frames the issue as follows: whether, on May 30, 2019, it was clear to a reasonable officer that it was unlawful to approach an "older female" suspect in an automobile with a drawn firearm and permit her eight seconds to exit the vehicle before pulling her out by the hair and handcuffing her when the suspect failed to heed blue lights and sirens but did not actively resist arrest or evade police. This court concludes it was. Although the precise factual scenario has not been addressed by the Fourth Circuit or the Supreme Court, Fourth Circuit precedent would put a reasonable officer on notice that this conduct was unconstitutional.

> Fourth Circuit case law clearly establishes that the use of gratuitous force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public. See, e.g., Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994) (denying qualified immunity on the ground that "no reasonable officer could have believed [the officer's] conduct to be lawful" after the officer "thr[ew] his weight around [the suspect's] right leg and wrench[ed] [the suspect's] knee" after the suspect allegedly stole a five dollar bill).

Johnson v. City of Fayetteville, 91 F. Supp. 3d 775, 804 (E.D.N.C. 2015). In Young, the Fourth Circuit established that

- 39 -

merely because a suspect poses some risk to officers that "does not render all force used by an officer reasonable." 355 F.3d at 758. Here, as in Young,[16] Plaintiff was stopped for a minor offense and did not actively resist officers. Each suspect posed some danger to officers. Young was armed. See id. at 757–58. Ms. Bottom was sitting in a running vehicle. However, even when faced with the possibility of a threat, "measures taken by an officer to disarm a suspect must be reasonable under the totality of the circumstances." Id. at 757.

Officer Barkalow's actions would not have appeared proportional to a reasonable officer in the circumstance. Moreover, his actions did not appear reasonable to the other officer in the circumstance — Officer Benfield. In Orem v. Rephann, Deputy Rephann sought qualified immunity after tasing a woman being taken to jail by another officer. 523 F.3d at 448. The other officer, "Deputy Boyles, who was transporting [the plaintiff] and bearing the brunt of her rage, did not request assistance and saw fit to first try to secure her hobble

---

[16] The Fourth Circuit's decision in Hupp, 931 F.3d at 323, and the Eastern District of Virginia's decision in Wilson, 2020 WL 7497801, at *11, which this court relied upon in determining that Officer Barkalow's conduct violated Plaintiff's Fourth Amendment rights, were both decided after the traffic stop at issue here. Therefore, this court may not rely on those cases in determining whether the law was clearly established. See Harlow, 457 U.S. at 818 (1982), (for purposes of qualified immunity, law must be "clearly established at the time an action occurred").

restraints — not use electric shock to restore order." Id. In Orem, as in this case, the primary officer used minimal force to subdue the plaintiff. As they were doing so, a secondary officer, ostensibly on the scene to assist, stepped in and used greater force than the primary officer thought necessary. Both intervening officers went well beyond what a reasonable officer would have considered justified by the circumstances.

Officer Benfield, who stood in the best position to assess the situation and the force needed, determined that the proportional response was to pull on Ms. Bottom's arm and talk her out of the vehicle. His actions provide strong evidence that Officer Barkalow's decision to escalate the situation by pulling Ms. Bottom from her vehicle and onto the ground by her hair was not "reasonable under the totality of the circumstances." Young, 355 F.3d at 757. As such, Officer Barkalow is not entitled to qualified immunity at this stage.

### 4. Officer Bouk's Use of Force

While Officer Barkalow's use of force was excessive, that conclusion does not automatically extend to all officers on the scene. See Peroza-Benitez, 994 F.3d at 165; Meadours, 483 F.3d at 421. The parties' analysis does not distinguish between Officer Barkalow's and Officer Bouk's actions and focuses predominantly on Officer Barkalow's conduct. (Compare MSJ Br.

- 41 -

(Doc. 55) at 10-17, with MSJ Resp. (Doc. 58) at 20-26.) In doing so, the parties fail to explain whether Officer Bouk's actions constitute excessive force and whether he was on notice that they were unconstitutional. (See id.)

Officer Bouk used considerably less force than Officer Barkalow during the encounter. Officer Bouk approached Ms. Bottom's vehicle with his baton and did not unholster a firearm. (Bouk Decl. (Doc. 54-1) ¶ 11; Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 7-8.) At the vehicle, Officer Bouk opened the passenger door and unbuckled Ms. Bottom's seatbelt. (Bouk Decl. (Doc. 54-1) ¶ 11; see also Bouk Video (Doc. 59-4) at 10:35-10:55.) After Officer Barkalow removed Ms. Bottom from the vehicle, Officer Bouk assisted in applying handcuffs. (Bouk Decl. (Doc. 54-1) ¶ 12; see also Bouk Video (Doc. 59-4) at 10:55-11:33.) The issue before this court is whether Officer Bouk's actions violated Ms. Bottom's constitutional rights.

"[T]he right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest" and handcuffing is a "standard procedure . . . [that] rarely constitute[s] excessive force where the officers were justified, as here, in effecting the underlying arrest." Brown, 278 F.3d at 369.

Here, officers had probable cause to believe Ms. Bottom had committed a misdemeanor which provided grounds to arrest her. This court is cognizant that "[a] lawful arrest does not categorically legitimize binding a person's wrists in chains." E.W. by & through T.W. v. Dolgos, 884 F.3d 172, 180 (4th Cir. 2018). However, Ms. Bottom failed to heed blue lights and was somewhat uncooperative with officers' attempts to subdue her, so the officers' decision to place Ms. Bottom in handcuffs was reasonable.

Once Ms. Bottom was on the ground, it took three officers a little less than forty seconds to secure her wrists in handcuffs. During this struggle, officers dislocated her shoulder. Ms. Bottom contends that Officer Barkalow had dislocated her shoulder by the time Officer Bouk began helping apply the handcuffs. (Compare Pl.'s Excerpts Bottom Dep. (Doc. 58-1) at 17, with Bouk Video (Doc. 59-4) at 11:00-11:10.) From the video of the incident, Officer Bouk did not use greater force than necessary to help secure the handcuffs. As such, this court finds Officer Bouk did not violate Plaintiff's constitutional rights.

Additionally, this court is not aware of any case holding that an officer may not secure a suspect in handcuffs after another officer used excessive force against that suspect. As

- 43 -

such, Officer Bouk would not have been on notice that helping to secure Plaintiff was unlawful. See Saucier, 533 U.S. at 202. Therefore, Officer Bouk is entitled to summary judgment on Plaintiff's excessive force claim.

### C. **Unreasonable Search Claim**

This court next considers whether Officer Bouk's searches of Ms. Bottom's purse and the map pocket of her vehicle violated her Fourth Amendment right to be free from unreasonable searches. Defendants argue the searches were permissible because Ms. Bottom was in custody and Officer Bouk believed she was headed to jail. (See MSJ Br. (Doc. 55) at 18.) They contend that removing an object from the map pocket was not a violation of the Fourth Amendment because it is standard procedure to conduct inventory searches of impounded cars and because the intrusion was too brief to violate the Fourth Amendment. (See id. at 19.) Plaintiff disagrees and contends Defendants had no lawful basis for either search. (MSJ Resp. (Doc. 58) at 27–30.)

#### 1. **The searches violated the Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It "generally requires police to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466

- 44 -

(1999). "A warrantless search may nevertheless be valid, and the evidence obtained from that search may be admissible, if the search 'falls within one of the narrow and well-delineated exceptions to the Fourth Amendment's warrant requirement.'" United States v. Matthews, 591 F.3d 230, 234 (4th Cir. 2009) (citing United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006).) Two exceptions are relevant here: inventory searches and searches incident to arrest. See Illinois v. Lafayette, 462 U.S. 640, 643 (1983) ("[T]he inventory search constitutes a well-defined exception to the warrant requirement."); United States v. Davis, 997 F.3d 191, 195 (4th Cir. 2021) ("One exception to the warrant requirement authorizes searches incident to a lawful arrest."). Though Defendants appear to argue Officer Bouk's searches were inventory searches, not searches incident to arrest, (see MSJ Br. (Doc. 55) at 17–19), this court will analyze both exceptions. Neither justifies Officer Bouk's searches.

"A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration, conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." United States v. Murphy, 552 F.3d 405, 412 (4th

- 45 -

Cir. 2009) (quoting <u>United States v. Banks</u>, 482 F.3d 733, 739
(4th Cir. 2007)).

> The vehicle must be in the lawful custody of the
> police at the time of the search, <u>United States v.</u>
> <u>Brown</u>, 787 F.2d 929, 932 (4th Cir. 1986), and the
> inventory search must be conducted pursuant to
> standard criteria, such as a uniform police policy,
> <u>Colorado v. Bertine</u>, 479 U.S. 367, 374 n.6 (1987). For
> a policy to be valid, "it must curtail the discretion
> of the searching officer so as to prevent searches
> from becoming a 'ruse for a general rummaging in order
> to discover incriminating evidence.'" <u>Banks</u>, 482 F.3d
> at 739. The purpose of the search must be to secure
> the vehicle or its contents "and not to gather
> incriminating evidence against the owner." <u>Brown</u>, 787
> F.2d at 932. Finally, officers must administer
> standardized search procedures in good faith. <u>Bertine</u>,
> 479 U.S. at 374.

<u>United States v. Cauthen</u>, 669 F. Supp. 2d 629, 633 (M.D.N.C.
2009) (cleaned up). Ms. Bottom contends Officer Bouk's searches
were not inventory searches because there is no evidence they
were conducted pursuant to "standardized criteria." (MSJ Resp.
(Doc. 58) at 29.) This court agrees.

Officer Bouk stated in an affidavit that:

> [w]henever a vehicle is towed and stored, it is
> standard procedure for any law enforcement agency I've
> been around to conduct an inventory search of the
> vehicle's interior and trunk to identify and list any
> items of value. . . . Because I believed the Sheriff's
> Office had Bottom under arrest and would be
> transporting her to jail, I looked through her purse
> pursuant to standard procedure to make sure it did not
> contain any prohibited items like drugs, cigarettes,
> or matches."

(Bouk Decl. (Doc. 54) ¶ 15.)

Officer Bouk's statement is insufficient to show his searches were inventory searches for several reasons. First, Defendants fail to provide any evidence of the standard procedure Officer Bouk references which would allow this court to determine if such a procedure existed and if it permitted the searches at issue. (See id.) Moreover, Officer Bouk does not say he was acting pursuant to a policy of the Salisbury Police or the Rowan County Sheriff's Office, merely that law enforcement agencies typically have such policies. (See id.) Additionally, this court has not been presented with evidence that any report was completed following the searches. (See Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 14-15 (noting it would be the practice of the Salisbury Police to complete an inventory report after any inventory search); see also Pl.'s Excerpt Barkalow Dep. (Doc. 58-5) at 26.)

Relatedly, immediately before the search of the map compartment, Officer Bouk said that he was "gonna get some gloves and look inside that car." (Bouk BWC (Doc. 54-11) at 12:10-12:14.) A reasonable jury could conclude that this statement implies that Bouk was "rummaging in order to discover incriminating evidence," rather than performing an inventory of the vehicle. See Banks, 482 F.3d at 739.

- 47 -

The searches of the map compartment and Ms. Bottom's purse are also not justified under the search incident to arrest exception. "The search-incident-to-arrest exception allows arresting officers to search both 'the arrestee's person and the area within his immediate control.'" Davis, 997 F.3d at 195 (citing Davis v. United States, 564 U.S. 229, 232 (2011)). "[P]olice can 'search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'" Davis, 997 F.3d at 195 (emphasis in original). Courts must determine whether it was reasonable for the police to believe the arrestee "could have accessed his car at the time of the search." Id. at 197 (citing Arizona v. Gant, 556 U.S. 332, 344 (2009)).

When Officer Bouk searched the map pocket, Ms. Bottom was sitting on the ground several feet from the front bumper of her car with her hands secured behind her back. (See Barkalow Video (Doc. 59-3) at 13:00–13:30, see also Bouk Video (Doc. 59-4) at 13:00–13:30.) Officer Bouk "knew that [Ms. Bottom] was secure and posed no threat." (Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 14.) Additionally, Officer Barkalow's body camera footage shows at least four officers on the scene and Officer Barkalow standing near Ms. Bottom. (See Barkalow Video (Doc. 59-3)

at 13:00-13:30.) Though Plaintiff remained near her car, the fact that she was handcuffed, surrounded by officers, and compliant with officers' requests demonstrates the officers "could not reasonably have believed . . . [Plaintiff] could have accessed [her] car at the time of the search." Gant, 556 U.S. at 344. Thus, Officer Bouk's search of the map pocket was not a search incident to arrest.

By the time Officer Bouk searched Ms. Bottom's purse, officers had helped her stand, positioned her by the driver's side wheel of her vehicle, and handcuffed her hands in front of her body. (Bouk Video (Doc. 59-4) at 16:25-21:25; see also Barkalow Video (Doc. 59-3) at 15:43-21:27.) Officer Barkalow was still standing with her, and several other officers remained on the scene. (See Barkalow Video (Doc. 59-3) at 15:43-21:27.) Ms. Bottom's purse was on the driver's seat as Officer Bouk stood in the open door and searched it. (Bouk Video (Doc. 59-4) at 16:25-21:25.) While Ms. Bottom may have been close enough to the driver's side door to reach her purse, this court finds officers "could not reasonably have believed . . . [Plaintiff] could have accessed [her] car at the time of the search" for several reasons. See Gant, 556 U.S. at 344. First, officers chose to position Ms. Bottom in that location and told her to "stay right there," (see, e.g., Barkalow Video (Doc. 59-3) at

- 49 -

17:35-18:13), suggesting there was no legitimate risk that Plaintiff would lunge for her purse.[17] Second, as Officer Bouk began searching the purse, Officer Barkalow was searching Ms. Bottom, once Officer Barkalow finished his search he continued to stand nearby. (Id.) Officer Bouk was between Ms. Bottom and her purse while searching the purse. (Id.) The officers' presence limited Ms. Bottom's ability to grab her purse. Additionally, Plaintiff's hands were secured, and she had repeatedly complained about the pain in her shoulder, (see, e.g., id. at 15:40-16:00, 17:35-18:13), so officers had reason to believe any lunge toward her purse would be difficult and painful. From these facts, Officer Bouk "could not reasonably have believed . . . [Plaintiff] could have accessed [her] car at the time of the search." See Gant, 556 U.S. at 344.

Finally, Defendants' argument that the map pocket search was such a "brief intrusion [that it] did not violate the Fourth Amendment," (MSJ Br. (Doc. 55) at 19), is squarely at odds with Supreme Court precedent. In Arizona v. Hicks, the Court explained:

> the "distinction between 'looking' at a suspicious object in plain view and 'moving' it even a few

---

[17] While Defendants do not make this argument, this court notes it would frustrate the purpose of the Fourth Amendment and its reasonableness standard to allow officers to order a suspect to stand next to their vehicle to convert an otherwise warrantless search into a search incident to arrest.

> inches" is much more than trivial for purposes of the
> Fourth Amendment. It matters not that the search
> uncovered nothing of any great personal value to
> respondent . . . . A search is a search, even if it
> happens to disclose nothing but the bottom of a
> turntable.

480 U.S. 321, 325 (1987). Officer Bouk opened Ms. Bottom's car door, felt around in the map pocket, removed a long black object, held the object for a few seconds, and placed it back in the pocket. (Bouk BWC (Doc. 54-11) at 13:00–13:30.) Just as the officers who lifted a turntable in Hicks violated the Fourth Amendment, 480 U.S. at 325, so too did Officer Bouk's search of the map compartment. "A search is a search." Id.

This court finds that Officer Bouk's search of Plaintiff's purse and the map compartment of her vehicle violated her Fourth Amendment right to be free from unreasonable searches. As such, Defendants' motion shall be denied as to Plaintiff's unreasonable search claim.

### 2. **Officer Bouk is not entitled to qualified immunity for the search**

When subject to suit under § 1983, state and local officials may assert qualified immunity to shield them "from liability for civil damages[,] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. Therefore, in deciding whether a government official is

entitled to qualified immunity, this court must first determine whether there was a violation of a person's constitutional rights and then analyze whether the right was "clearly established" so that a reasonable officer would know "that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. The doctrine of "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft, 563 U.S. at 743 (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citation omitted). "Although earlier cases involving fundamentally similar or materially similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Jones, 325 F.3d at 531 (internal quotation marks and citation omitted).

Officer Bouk's searches of Plaintiff's purse and map pocket violated her Fourth Amendment rights. The law proscribing these searches was clearly established. Supreme Court precedent has long-established "the requirement that [inventory searches] be

- 52 -

conducted according to standardized criteria." Bertine, 479 U.S.
at 374 n.6. Viewing the evidence in the light most favorable to
Plaintiff, there is no evidence Officer Bouk was operating
pursuant to "standardized criteria" when he searched
Ms. Bottom's map pocket or purse. See id.

Likewise, it is well-settled that a search incident to
arrest is limited to "the arrestee's person and the area 'within
his immediate control.'" Davis, 564 U.S. at 232. Officers may
not search the passenger compartment of an arrestee's vehicle
unless they could "reasonably have believed. . . that [the
arrestee] could have accessed her car at the time of the
search." Gant, 556 U.S. at 344. As this court explained above,
Officer Bouk's searches were not searches of the suspect's
person or of the area within her immediate control, nor could a
reasonable officer have believed that Ms. Bottom could have
gained access to the passenger compartment of her vehicle during
the searches. Therefore, at this stage, Officer Bouk is not
entitled to qualified immunity for his searches. This court will
deny Defendant's Motion for Summary Judgment as to this claim.

D. **Monell Claims**

Plaintiff also asserts two Monell Claims against the City
of Salisbury. (SAC (Doc. 44) at 19-22.) Municipalities may be
held liable under 42 U.S.C. § 1983 for constitutional torts

caused by the municipality. City of Canton v. Harris, 489 U.S. 378, 385 (1989). To prove municipal liability, a plaintiff must plausibly allege "(1) that the defendants acted under color of state law and (2) that the plaintiff suffered a deprivation of a constitutional right as a result of that action." Davis v. Durham Mental Health Developmental Disabilities Substance Abuse Area Auth., 320 F. Supp. 2d 378, 403 (M.D.N.C. 2004)).

Defendants mount a single challenge to Plaintiff's Monell claims: she failed to "prove a violation of her constitutional rights." (MSJ Br. (Doc. 55) at 20.) As this court reaches the opposite conclusion, (see supra Section IV.B–C), Defendants' argument fails. Therefore, this court will deny Defendants' motion for summary judgment on Plaintiff's Monell claims.

### E. Assault and Battery

Plaintiff also asserts a claim for assault and battery against Individual Defendants. (SAC (Doc. 44) at 22–23.) Defendants argue this claim must fail because the use of force was objectively reasonable, and they are entitled to public official immunity. (MSJ Br. (Doc. 55) at 20–22.) Plaintiff contends she has alleged sufficient facts to show the Officers acted with malice. (See MSJ Resp. (Doc. 58) at 10 n.5.)

"[A] civil action for damages for assault and battery is available . . . against one who, for the accomplishment of a

- 54 -

legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." <u>Thomas v. Sellers</u>, 142 N.C. App. 310, 315, 542 S.E.2d 283, 287 (2001). As stated above, this court cannot find that the force used by Officer Barkalow was reasonable as a matter of law. Accordingly, this court will not grant summary judgment on Ms. Bottom's assault and battery claim based on Defendants' reasonableness argument.

Considering Defendants' argument that they are entitled to public official immunity, in North Carolina, public official immunity is a judicially-created doctrine that "shields public officials from personal liability for claims arising from discretionary acts or acts constituting mere negligence, by virtue of their office, and within the scope of their governmental duties." <u>Bartley v. City of High Point</u>, 381 N.C. 287, 294, 873 S.E.2d 525, 533 (2022). Its "chief function" is "to shield public officials from tort liability when those officials truly perform discretionary acts that do not exceed the scope of their official duties." <u>Id.</u> Police officers performing their duties are public officials for purposes of the immunity. <u>Id.</u> at 295, 873 S.E.2d at 533. "Distinct from qualified immunity under § 1983, which is a purely objective analysis, North Carolina's public official immunity doctrine 'involves a determination of the subjective state of mind of the

governmental actor.'" <u>Knibbs v. Momphard</u>, 30 F.4th 200, 227 (4th Cir. 2022) (citing <u>Andrews v. Crump</u>, 144 N.C. App. 68, 76-77, 547 S.E.2d 117, 123 (2001)).

"An individual will not enjoy the immunity's protections if his action 'was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt.'" <u>Bartley</u>, 381 N.C. at 294, 873 S.E.2d at 533 (citations omitted). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." <u>Grad v. Kaasa</u>, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "An act is wanton when it is done of wicked purpose or when done needlessly, manifesting a reckless indifference to the rights of others." <u>Id.</u> at 313, 321 S.E.2d at 890-91.

Public official immunity "is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would have known to be contrary to his duty." <u>Maney v. Fealy</u>, 69 F. Supp. 3d 553, 564 (M.D.N.C. 2014) (quotation marks omitted) (citing <u>Bailey v. Kennedy</u>, 349 F.3d 731, 742 (4th Cir. 2003)).

As this court has determined that Officer Barkalow's use of force violated Plaintiff's clearly established rights of which a reasonable officer would have known, (<u>see</u> <u>supra</u> Section IV.B),

- 56 -

Officer Barkalow cannot avail himself of public official immunity. In contrast, Officer Bouk did not use excessive force, (see supra Section IV.B.3), so Plaintiff may not maintain an assault and battery claim against him. See Thomas, 142 N.C. App. at 315, 542 S.E.2d at 287.[18] As Officer Bouk's actions were not excessive or "contrary to his duty," Grad, 312 N.C. at 313, 321 S.E.2d at 891, he is entitled to public official immunity.

Therefore, Defendants' motion for summary judgment as to Plaintiff's assault and battery claim will be granted as to Officer Bouk and denied as to Officer Barkalow.

### F. __Statutory Action on Surety Bond__

Plaintiff's complaint also asserts a claim against Sheriff Auten's surety bond. (SAC (Doc. 44) at 23-24.) Sheriff Auten has been dismissed from this action. (See Stipulation of Voluntary Dismissal With Prejudice as to Rowan County Defs. (Doc. 53); MSJ Resp. (Doc. 58) at 5 n.2.) So, this court will grant Defendant's motion for summary judgment on this claim.

---

[18] There is no other evidence that Officer Bouk acted with malice. While Plaintiff claims Officer Bouk agreed with Officer Barkalow "that [Ms. Bottom] had 'earned it,'" (MSJ Resp. (Doc. 58) at 12), Officer Bouk merely stated that Ms. Bottom's failure to exit her vehicle provided legal justification to remove her, (Pl.'s Excerpts Bouk Dep. (Doc. 58-8) at 37-38). While this court disagrees, Officer Bouk's conclusion about Officer Barkalow's authority is insufficient to show malice.

## V.  CONCLUSION

This court will grant in part and deny in part Defendants' Motion for Summary Judgment. (Doc. 54.) Defendants are entitled to summary judgment on Plaintiff's excessive force claim and assault and battery claim as to Officer Bouk. Defendants are also entitled to summary judgment on Plaintiff's selective enforcement claim and her claim for statutory action on surety bond. Defendants are not entitled to summary judgment on the excessive force and assault and battery claims as to Officer Barkalow, the unreasonable search claim, or the Monell claims against the City of Salisbury.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 54), is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as to Plaintiff's claims of selective enforcement, statutory action on surety bond, and the claims for excessive force and assault and battery as to Officer Bouk. The motion is **DENIED** as to Plaintiff's claims of unreasonable search, excessive force and assault and battery as to Officer Barkalow, and the Monell claims.

This the 14th day of August, 2023.

_William L. Osteen, Jr._
United States District Judge

- 58 -